869 A.2d 939

VICTOR MANUEL CABALLERO, PLAINTIFF–APPELLANT, v. RI-
CARDO MARTINEZ AND LEROY SMITH, DEFENDANTS, AND
THE UNSATISFIED CLAIM AND JUDGMENT FUND BOARD
AND KAREN L. SUTER, COMMISSIONER OF INSURANCE OF
THE STATE OF NEW JERSEY, DEFENDANTS–RESPON-
DENTS.

Superior Court of New Jersey
Appellate Division

Submitted February 16, 2005—Decided March 10, 2005.

Before Judges CONLEY, BRAITHWAITE and LISA.

*Victor M. Covelli,* attorney for appellant.

*Hoagland, Longo, Moran, Dunst & Doukas, L.L.P.,* attorneys
for respondents (*Jeffrey C. Maziarz,* on the brief; *John C. Si-
mons,* of counsel).

PER CURIAM.

Plaintiff appeals the dismissal following an evidentiary hearing
of his complaint against the Unsatisfied Claim and Judgment
Fund for automobile accident non-economic damages. The com-
plaint was dismissed based upon the trial judge's conclusion that,
at the time of the accident, he was not a "qualified person" as
required by *N.J.S.A.* 39:6–62. On appeal, plaintiff contends:

POINT I: THE TRIAL COURT DISREGARDED THE STATUTORY LAN-
GUAGE IN FINDING THAT THE PLAINTIFF WAS NOT ENTI-
TLED TO COMPENSATION FROM THE UNSATISFIED CLAIM
AND JUDGMENT FUND.

POINT II: THE TRIAL COURT IGNORED EXISTING CASELAW IN DE-
TERMINING THE PLAINTIFF WAS NOT A RESIDENT OF NEW
JERSEY.

POINT III: THE PLAINTIFF WAS DENIED EQUAL PROTECTION UNDER THE LAW WHEN THE COURT RULED HE WAS NOT A RESIDENT OF NEW JERSEY.

We have considered these contentions and reject them. We affirm for the reasons set forth by Judge Jamie S. Perri whose written opinion is reported at 376 *N.J.Super.* 223, 869 *A.*2d 969 (Law Div.2005).

Affirmed.

LISA, J.A.D., dissenting.

The issue in this case is whether plaintiff, Victor Manuel Caballero, a Mexican national illegally living in the United States, is a "resident of the State" and therefore a "qualified person" under *N.J.S.A.* 39:6–62, eligible to collect benefits from the Unsatisfied Claim and Judgment Fund (UCJF) for injuries suffered in a motor vehicle accident. Plaintiff meets all other eligibility requirements of the UCJF Law, *N.J.S.A.* 39:6–61 to–90.1. By adopting the Law Division opinion, the majority holds, in effect, that an undocumented alien cannot be a bona fide resident of New Jersey within the meaning of the UCJF Law. I disagree and dissent.

The test for eligibility under the UCJF Law is residency, not domicile. A resident within the intent and policy of *N.J.S.A.* 39:6–62 may maintain his or her domicile elsewhere. *Sullivan v. Saylor*, 79 *N.J.Super.* 1, 5, 190 *A.*2d 193, 195 (App.Div.1963). To establish residence under the UCJF Law, an individual must demonstrate by acts and conduct an intent, as of the date of the accident, to remain in New Jersey for "an indefinite period." *Continos v. Parsekian*, 68 *N.J.Super.* 54, 60, 171 *A.*2d 663, 666 (App.Div.1961) (citing *Collins v. Yancey*, 55 *N.J.Super.* 514, 522, 151 *A.*2d 68, 73 (Law Div.1959)). Implicit in the concept of residence "is a degree of permanence in contrast with the situation which obtains when a person is merely transiently staying at a given address and with the formed intention of shortly going elsewhere." *Ibid.* A mere "sojourner" will not qualify, for " '[m]ere presence in a place unaccompanied with any intention to

remain there for any length of time' does not constitute a residence." *Id.* at 60–61, 171 *A.*2d at 666 (quoting 17A *Am. Jur. Domicil,* § 9, p. 201).

The Law Division concluded plaintiff does not satisfy these standards because his "tenuous ties to the State of New Jersey during the five months before the accident, coupled with his status as an illegal immigrant, evidence a relationship with the state that falls short of those of a bona fide resident." *Caballero v. Martinez,* 376 *N.J.Super.* at 229, 869 A.2d at 976 (Law Div.2005), *aff'd o.b.,* 376 *N.J.Super.* 223, 869 *A.*2d 969 (App.Div.2005). In my view, plaintiff's ties with New Jersey were anything but tenuous and, notwithstanding his illegal immigration status, he demonstrated by his acts and conduct an actual intention to continue to live in New Jersey for a substantial period of time.

The accident occurred on August 8, 2001. The hearing to determine plaintiff's UCJF eligibility was conducted on May 18, 2004. Plaintiff's older brother, Sandro, was the first of plaintiff's immediate family members to leave the family home in Mexico and come to the United States. Sandro came at age sixteen in 1996. He immediately moved in with cousins in Bradley Beach and he has lived and worked continuously in New Jersey ever since. His purpose in coming was to have better employment opportunities so he could have a better life. He has never returned to Mexico. At the hearing, Sandro expressed his intention to return to Mexico in another six or seven years, after saving enough money to have a better life in Mexico, although his preference is to live in New Jersey the rest of his life.

In 1999, plaintiff's father, Moises Silva, entered the United States and immediately settled in Belmar. He came for the same reasons as Sandro, and he too has continuously lived and worked in New Jersey, without ever returning to Mexico since his arrival.

In March 2001, after crossing the border, the seventeen-year-old plaintiff flew from Los Angeles to Newark, where Sandro picked him up. Plaintiff moved in with Sandro and their cousins. He came for the same reasons as his father and brother. Plaintiff

obtained employment in a restaurant soon after his arrival. After about two months he changed jobs, becoming employed at Spring Computers in Lakewood, where he was employed at the time of the accident. He was still working there at the time of the hearing, three years later. At the hearing, plaintiff explained he was now earning $400 per week as compared to the $6 per day he earned in Mexico. He stated he intended to stay in New Jersey for about five years, with the expectation that he would save enough money to improve his and his family's lot in life. But he too stated he would prefer to stay in New Jersey permanently.

Plaintiff's mother, Herlinda, entered the country in April 2003, and immediately moved in with Moises Silva, her husband of twenty-four years. Plaintiff and plaintiff's girlfriend live with plaintiff's parents. Herlinda stated she intends to stay here about five years and, after the family saves enough money, eventually return to Mexico. Plaintiff also has a sister, who, at the time of the hearing, was seventeen-years-old, living in Mexico with relatives, and still attending school.

Plaintiff and his family have, over several years, established substantial roots in New Jersey. Although plaintiff has lived in several residences during that time, they have all been in close proximity to each other in Monmouth and Ocean Counties, he has always lived with relatives, and he has held steady employment in the immediate area. Plaintiff has a network of immediate and extended family members and friends plus stable employment.

Plaintiff's true intent must be based on the totality of the circumstances. *Collins, supra,* 55 *N.J.Super.* at 521, 151 *A.*2d at 73. Although his state of mind at the time of the accident is controlling, his post-accident acts and conduct are evidential in either corroborating or undermining his expression of intent at the critical time. *See Continos, supra,* 68 *N.J.Super.* at 57, 60, 171 *A.*2d at 666; *Collins, supra,* 55 *N.J.Super.* at 520, 151 *A.*2d at 72. In this regard, for example, plaintiff proffered at the hearing a 2002 W-2 Form to demonstrate his continued employment. The judge refused to allow it in evidence, stating "it's irrelevant. The

issue to be decided is his residency as of the date of the happening of the accident." I consider this ruling erroneous, and it typifies the unduly restrictive approach taken in evaluating plaintiff's residency status.

This record leads to the inescapable conclusion that, based on his acts and conduct before and after the accident, plaintiff intended to live in New Jersey for a substantial period of time. I find unpersuasive the circumstances listed by the Law Division in support of the finding that plaintiff's lifestyle in New Jersey was "transient" in nature. The "appearance" that plaintiff brought no possessions from Mexico nor accumulated any in New Jersey before the accident is not supported by the record. Even if that inference could reasonably be drawn, it is a fact indicative more of poverty than a lack of intent to stay in New Jersey. Plaintiff had no rent receipts because the apartment was leased to his cousin, to whom plaintiff contributed his share of the rent. Written receipts would not be expected in this situation. Plaintiff did not enroll in school because he came here to work.

In *Collins*, the plaintiff had previously lived in North Carolina and Virginia. *Collins, supra,* 55 *N.J.Super.* at 517, 151 *A.*2d at 70. He then left, lived and worked in Pennsylvania for about six weeks, and then moved to New Jersey, where he lived and worked for about five months before being involved in an automobile accident. *Id.* at 517–18, 151 *A.*2d at 70–71. He was hospitalized for several weeks after the accident and then moved back to Virginia so his sister could care for him while he convalesced. *Id.* at 518, 151 *A.*2d at 71. The court rejected the UCJF's argument that the plaintiff's post-accident act of moving back to Virginia established that his presence in New Jersey had only been "transitory in character." *Id.* at 520–22, 151 *A.*2d at 72–73. That evidence was relevant but, in light of all the circumstances, the court held that the plaintiff was not, at the time of the accident, a "traveler or transient" and that "his residence had that permanency which qualifie[d] him for the recourse contemplated by the [UCJF] statute." *Ibid.*

We have cited *Collins* with approval, *see Sullivan, supra,* 79 *N.J.Super.* at 5, 190 *A.*2d at 195; *Continos, supra,* 68 *N.J.Super.* at 58–60, 171 *A.*2d at 665–66, and I agree that *Collins* was correctly decided. If it were not for plaintiff's illegal immigration status, the outcome of this case would be controlled by the *Collins* rationale and would result in a finding of residency. Indeed, this would be a stronger case because after the accident plaintiff remained in New Jersey with his family. The point is this. The only thing separating this case from established precedent is plaintiff's illegal immigration status. That circumstance is the linchpin of the Law Division's holding.

The Law Division framed the issue in the case this way: "The issue presented is whether an undocumented alien, who had been in New Jersey for a period of five months and was subject to deportation at any time, was capable of forming the requisite reasonable intent to establish residency in the State of New Jersey for purposes of recovering benefits from the UCJF." *Caballero, supra,* 376 *N.J.Super.* at 225, 869 *A.*2d at 970. My answer is "yes." A multitude of undocumented aliens have come to this country, raised families, and lived here indefinitely. Plaintiff knew this. His brother and father were prime examples. There was no evidence that plaintiff had committed a crime or was being pursued by the immigration authorities for any reason. He was not the subject of an active deportation proceeding.

The mere possibility of deportation, without more, would not negate or interfere with plaintiff's reasonable intent to remain here for a substantial time nor his reasonable belief that he could successfully do so. Plaintiff's immigration status is an appropriate factor to consider in the totality of the circumstances. In some cases, illegal immigration status and its effect on the individual may tip the scales against a finding of true intent to remain in a place for a substantial time. But that is not the case here.

The Law Division answered the question in the negative: "Without the legal ability or authority to remain in the state, plaintiff was incapable of reasonably forming the requisite intent

to 'remain for any length of time' in the State of New Jersey." *Id.* at 229–30, 869 *A.*2d at 973. I consider this proposition unfounded. For the reasons already stated, it is factually unsupported by the record. I find equally unavailing the legal authorities relied upon by the Law Division for support.

*Buscema v. Buscema,* 20 *N.J.Super.* 114, 89 *A.*2d 279, 280 (Ch.Div.1952), is factually and legally inapposite. There, the court found a lack of jurisdiction under the Divorce Act because the plaintiff was not a bona fide resident of this state when the cause of action arose. *Id.* at 115, 89 *A.*2d at 279–80. The plaintiff was an Italian seaman, injured while his ship was in an American port, who was hospitalized and then remained here for an undisclosed time. *Ibid.* The plaintiff was the subject of an active deportation proceeding, "apprehended by the immigration authorities and remain[ing] here under restraint." *Ibid.* The legal issue there was different than here, because for Divorce Act purposes "residence" in *N.J.S.A.* 2A:34–10 means "domicile." *Voss v. Voss,* 5 *N.J.* 402, 406–07, 75 *A.*2d at 891–92 (1950); *Raybin v. Raybin,* 179 *N.J.Super.* 121, 126–27, 430 *A.*2d 953, 956 (App.Div.1981). And, factually, the plaintiff's immigration status and its effect on him precluded a reasonable intent to remain indefinitely in the United States.

The Law Division in this case noted that in *Das v. Das,* 254 *N.J.Super.* 194, 603 *A.*2d 139 (Ch.Div.1992), the court reached a result contrary to that in *Buscema. Caballero, supra,* 376 *N.J. Super.* at 229 n. 10, 869 *A.*2d at 972–73 n. 10. In *Das,* the court rejected the notion that illegal immigration status would automatically negate the intention of a divorce litigant to make New Jersey her permanent home. *Das, supra,* 254 *N.J.Super.* at 198, 603 *A.*2d at 141–42. The court reasoned that, although an illegal alien "may be deportable, given the uncertainty of knowing when, if ever, deportation proceedings will be commenced, this court is persuaded that no legal disability precluding a change of domicile should exist." *Id.* at 199, 603 *A.*2d at 142. The court further explained:

> An inflexible rule such as that espoused by defendant would require state trial courts to assume (or possibly usurp) the very function of the Federal Immigration and Naturalization Service. The adjudication of potentially complex questions of federal immigration law and policy is better left to that Federal Agency. Indeed, one can easily envision the difficulties inherent in resolving alleged violations of the immigration laws which are not so apparent, or more probably, require determinations and/or the implementation of an ever evolving federal immigration policy, which itself may be affected by changes in the political climate. Moreover, even where a purported violation of immigration law is clear, or is conceded to exist, one cannot predict with any certainty when, if ever, deportation proceedings would be commenced.
>
> [*Id.* at 200, 603 *A.*2d at 142–43.]

This reasoning is sound and applies with even greater force here, where the easier-to-establish legal status of "resident," rather than "domiciliary," is at issue.

The Law Division also relied on *Monmouth Medical Ctr. v. Kwok*, 183 *N.J.Super.* 494, 444 *A.*2d 610 (App.Div.1982), as authority for its disparate treatment of illegal aliens and others. *Caballero, supra,* 376 *N.J.* at 230, 869 *A.*2d at 973. However, in *Kwok*, the New Jersey Medicaid regulation under review provided, "The applicant must be a resident of the United States who is either a citizen or an alien lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." *Kwok, supra,* 183 *N.J.Super.* at 496, 444 *A.*2d at 611. This regulation was consistent with the cognate mandatory federal regulation. *Id.* at 497, 444 *A.*2d at 611. We found no violation of the Equal Protection Clause. The sole issue was the constitutionality of the regulation. *Id.* at 496, 444 *A.*2d at 611. *See also Crespo v. Evergo Corp.*, 366 *N.J.Super.* 391, 396–99, 841 *A.*2d 471, 474–476 (App.Div.), *certif. denied*, 180 *N.J.* 151, 849 *A.*2d 184 (2004) (disallowing illegal alien's New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to–42, claim for non-economic damages arising out of alleged discriminatory termination, because she was statutorily barred from lawful employment by federal immigration law, and the LAD allows employers to restrict employment to United States citizens where required by federal law). *And see N.J.S.A.* 44:10–48, where the Legislature has expressly limited benefits under the Work First New Jersey

program to "persons who are United States citizens or eligible aliens [as statutorily defined]" and authorized conditionally limited benefits for certain "legal aliens," *N.J.S.A.* 44:10–48a, while declaring ineligible for benefits "illegal aliens" and "other aliens who are not eligible aliens." *N.J.S.A.* 44:10–48b(3) and (4).

The issue before us is quite different. Our Legislature has not distinguished in the UCJF Law between different categories of residents. *N.J.S.A.* 39:6–62 embraces all residents, namely those living in New Jersey, who have the actual intention to live here for a substantial time, as opposed to those transiently here who intend in the near future to go elsewhere. All such individuals live in the state on an ongoing basis and are regularly exposed in the state to injuries caused by financially irresponsible motorists. It seems plain that all such individuals are intended by the Legislature to be given some minimal level of protection against being remediless for such injuries. The UCJF Law is social legislation, which should be liberally construed to provide this limited benefit to all individuals within the classification defined by the Legislature. *Continos, supra,* 68 *N.J.Super.* at 58, 171 *A.*2d at 665.

Any concern implied by the Law Division about improper depletion of the Fund by payment of benefits to an illegal immigrant who has not contributed to the Fund, *see Caballero, supra,* 376 *N.J.Super.* at 226, 869 *A.*2d at 970, is unfounded. By the terms of the UCJF Law, *no* beneficiaries contribute, because if they are covered by an automobile insurance policy, and therefore pay UCJF surcharges, they cannot be a "qualified person." *N.J.S.A.* 39:6–62.

Other courts have applied the principle of "dual intent" in circumstances such as those presented in this case. The Utah Supreme Court found no inconsistency in the intent of a divorce litigant to live in this country for the rest of her life even though her visitor's visa would expire in about five months, requiring her return to her country of origin. *Bustamante v. Bustamante,* 645 *P.*2d 40, 42 (Utah 1982). The court held that an alien could establish domicile based on a " 'dual intent'—an intent to remain if

that may be accomplished and at the same time an intent to leave if the law so commands." *Ibid.* A similar result was reached in *Babouder v. Abdennur,* 41 *Conn.Supp.* 258, 566 *A.*2d 457 (1989). This rationale accurately describes the intent credibly expressed by plaintiff and his family members. There is no inconsistency and no impediment to having the intent required, under long-established principles, for residency status.

Implementation and enforcement of immigration policies and laws are the responsibility of the legislative and executive branches of the federal government. Substantial discretion is inherent in enforcement activities, and political and foreign policy considerations by the federal authorities play an ongoing, pervasive and ever-changing role. Construction of our state's UCJF law by a state court should strive to implement the intent of our Legislature in adopting it. We should not shape that construction based on any perception that it might assist the federal authorities in enforcing the immigration laws. If those authorities choose to identify and take action against individuals such as plaintiff, that is their prerogative. Our construction should not serve to deprive a bona fide resident of our state of a benefit provided to him by our Legislature because we believe it might advance enforcement of the federal immigration laws and policies. Such a course is not only ill-conceived as a matter of statutory construction, but it might well be advancing a federal immigration policy which the responsible authorities do not wish to pursue or to which they might be indifferent.

It is not for the judiciary to rewrite the statute. If the Legislature chooses to limit the class of eligible beneficiaries, *e.g.* by requiring a minimum length of residency or excluding residents who are illegal aliens, it may do so. As I see it, however, under the present law plaintiff is a bona fide resident of this state and is eligible for UCJF benefits.

I would reverse.